The next matter, number 25-1385, Laurel D. Libby et al. v. Ryan M. Fecteau et al. At this time, would counsel for the appellants please come to the podium and introduce themselves on the record to begin. Good morning, and may it please the Court, Taylor Meehan on behalf of Representative Laurel Libby and her constituents. May I reserve three minutes for rebuttal, Your Honor? Yes. An essential feature of a legislature is equal representation, where each legislator serves as the voice and vote of her set of constituents. That's what this case is about, the denial of that essential feature of equal representation in the main house. Legislative immunity is inapplicable in such a case. Immunity shelters legislative acts, but here, singling out one legislator to deny her ability to speak or vote for the duration of her term is the antithesis of a legislative act. Well, can we just aggregate those? I mean, the brief just merges voting and speaking throughout, and I find that analytically difficult because I can see, you know, Kerrigan especially talks about the vote belonging to the constituent, and I see that. I see something different going on with speaking, which is not really addressed, and there's a lot of emphasis in the briefs. This voting remedy does not really exist in very many places, if at all, that's sort of punishing someone by the voting. But the idea of gaveling someone down for what they said in a legislative debate does seem, at least my understanding, although the briefs don't really get into this as much as I would have liked, not an unusual situation. Now, you're trying to make it into, well, it's different because it targeted this representative for what they said outside, but what I'm thinking about in this case is, well, what does this look like going forward? Well, the speaker gavels this person down for X reason and that person down for Y reason, and that's like refereeing the debate. And sometimes it's okay and sometimes it's not, and that strikes me as at the heart of legislative immunity, and the briefs did not disaggregate those things in the way that would have been helpful. So, two responses, Your Honor. The second one I want to try to convince you that they do go hand in hand. But as for what we're seeking here, I do want to clarify, I don't think the relief we're seeking runs into the problem of the speaker can gavel down so-and-so and they can't gavel down a different legislator. All we're asking is to restore the status quo as it's been in the Maine House for 200 years, where representatives would be when she pushes her button to speak, is recognized to speak just like every other legislator. I assume what will happen is she will stand up, she will attempt to speak, the speaker will gavel her down and say, pursuant to House Resolution X, Y, and Z, you cannot speak until you have apologized as required and move on to the next person. Right. We are seeking the ability for her to be recognized in debate just like every other legislator is recognized. The case isn't a time, place, manner restriction. It's just when she pushes her button, she is treated equally. Now, as to why they go hand in hand... You're asking for an injunction, though. To whom does the injunction apply? To the extent there's any difference between the speech and voting, it's to the relief, Your Honor. So we agree that the injunction for the speaking restriction probably needs to run to the speaker. That's different than the voting restriction, which can very easily run to the clerk. That is problematic, right? Let me just say something at the top. Whatever the merits are, whether this is a good idea, a bad idea, or an unconstitutional idea, the thing that we're focused on is legislative immunity. And embedded in immunity is the idea that certain unconstitutional actions will be allowed to persist for other policy reasons. And the policy reason here is federal courts getting into the machinations, at least I think, the machinations of the floor of who gets to speak, you were gaveled down for this reason, you were gaveled down for that reason, and now we're going to be making those judgments. And that seems to be, at least right now in my thinking, beyond where we should be, which might be very different than voting. For this particular speech restriction here, and Cushing says it has to be a context-specific inquiry, the speech restriction here isn't that Representative Libby wants to speak longer, that she wants to speak on something not germane. She just wants to be able to speak like every other legislator has. And for that, we have argued primarily the silencing of her indefinitely for the rest of her term is not a legislative act. Even if you disagree with me on that, it's so extraordinary so as to warrant judicial review. And we know that because all the way back to James Wilson and Justice Story, it has been understood that speaking and voting go hand in hand. We're not asking, again, for her to have any lengthy amount of time to speak. It's just when she pushes her button, she's recognized like everyone else. Relief against the speaker is not a problem. I think Gravel is our best case on this. At pages 620 to 621 of Gravel, the Supreme Court says, of course we can grant relief against legislators themselves when they undertake a non-legislative act. They're republishing the Pentagon Papers here silencing a legislator for the duration of her term. It's not a temporary silencing. She is not allowed to speak for the rest of her term. So you would say it's not a legislative act because it's the act of silencing for the extent of the term. But would a legislative act by the speaker be, I'm gaveling you down today for your behavior that I don't like? Right. We are not, this is not a challenge to any House rule. Our challenge is to the silencing of her, the refusal to recognize her for the rest of her term. There are House rules about- Well, we've taken a House rule that we have. There's a House rule, and we've decided to apply it to this person for this conduct. And again, it very well may be unconstitutional what they did, but it gets to how is this debate on any given day in the House going to operate? And what's going to happen on this day is Libby, pursuant to the House rules, is not going to be able to speak. And that, I mean, again, bad or good, why is that not getting us into the middle of the House's regulation of itself as far as the debate in the House? Because of the distinct circumstances here where it's not just on any given day. It's for the rest of her elected term. She's not allowed to make a floor speech. That matters not just for her right to speak on behalf of her constituents. It also matters for her right to vote on behalf of her constituents. Every other legislator can get up and explain their vote and make a floor speech, share the views of their constituents, and try to change the minds of their colleagues. Your Honor, may I finish this last point? Yes, I suspect we'll go over our time today. Every legislator has that right. Representative Libby, her vote in that way is diluted vis-a-vis her colleagues. She has no way to persuade her other legislators or to share the views of her constituents. And as she explains at Joint Appendix 115 to 116, that denies her one of her two critical functions, especially as a member in the minority. But this case is nothing like a generally applicable House rule to which you could violate, say, a time limitation, a germainance requirement, a direct code violation, which, of course, the Speaker could gavel that down. Our case doesn't touch those issues. What I think is telling about the defendants' arguments in this case is below they agreed that there were circumstances where legislative immunity would not apply, including against the Speaker, including for the speech restriction, presumably. At JA 138 to 139, they agree that should the Speaker refuse to recognize, for example, a legislator because of his or her minority status, that's outside the bounds of immunity. But how do you get yourself there? That's important. But how do you, what is analytically, how do we get to that decision? I mean, other than it's important. And you might just say that Kilbourn, it's extraordinary. That's hard because what they're talking about in Kilbourn seems quite out there. What do you do to get yourself there other than to say it's important? I think you could do either path. The path that we think is most doctrinally administratable is that it is not a legislative act to silence a legislator for the duration of their term. And we know that based on history. Let me give you a few data points. For starters, to determine whether something's a legislative act, we look to history. We don't look at the defendant's assertions that it's a legislative act. The best authority for that is footnote 15 of Gravel, which says, of course, a legislator cannot invoke immunity and thereby enlarge their power. Instead, you've seen cases like Kilbourn and Hutchinson against Procner that, of course, undertake a historical analysis about things legislatures tend to do and things legislatures don't tend to do. And here, Justice Wilson said 200 years ago that the purpose of immunity is to preserve the fullest liberty of speech for every legislator. And I think that's one of our best historical authorities for the point that denying a legislator liberty of speech on the floor on behalf of her constituents for the rest of her term. You just add for the rest of her term, and I understand why you'd do that. But I guess the problem is every time someone's gaveled down, their liberty of speech may be infringed, and maybe for terrible reasons. You may be gaveled down in this speech because I, the speaker, don't like what you're saying on the topic. It's completely viewpoint-based. It's abhorrent. Does it apply to that? Our rule would not apply to that. And that's problematic because how are we making these distinctions about, well, that's unconstitutional. What I just told you is unconstitutional. But one's okay and one's not, and what's the line there? Why? I mean, that guy was gaveled down for his speech on a topic the speaker didn't like such that his voice was not heard because of his ideas. That's pretty terrible. It is terrible, Your Honor, but Cushing says we have to look at the context of each individual case. And each case is going to present unique factual scenarios, and we'll have different... And in Cushing, right, immunity was granted. And in Harwood, immunity was granted because I think they were getting at, this is how the floor is operating. Everybody in Harwood, it's the speaker will exclude certain people from the floor. Whether they're right or not, he's immune from that. Cushing, everyone can vote, and this way is how the House operates. You took the words out of my mouth, Your Honor. I actually think Cushing and Harwood provide a nice dividing line between those cases and our cases. So in both of those cases, based on the record the court had, they were generally applicable rules to private lobbyists or to all legislators. And the central difference here is that this is a rule silencing Libby alone, Representative Libby alone, and Cushing already said that. So distinguish my hypothetical then. My hypothetical is at this moment the speaker uses authority of four referees to engage in complete viewpoint discrimination, and then the legislator brings a lawsuit. Is that, would you say that's not subject to legislative immunity because he targeted that member to silence her? Based on the words used in Cushing, there's possibly an immunity argument. It's the record, the legislative record, no discovery, shows they're targeting for some reason other than the House rules. But it's in your hypothetical. The legislator, or the speaker, gavels down that legislator and says, you are out of order. You are violating our germaneness requirement. There is no case there because the germaneness rule, no different than the rule in Cushing, is a generally applicable rule that applies to all legislators. And here again, we are just asking for the same equality. We will comply with the germaneness rule, time limitations, everything else, but every legislator in the main House, so long as complying with those generally applicable rules, is allowed an opportunity to speak on a bill before voting on it to share the views of their constituents, persuade their colleagues, unless someone calls the previous question. Can I get back to Judge Ephraim's question of sort of how you get there? And I understand the answer you just gave, but when you started your argument, you talked about extraordinary, that this is extraordinary, and legislative immunity doesn't apply here. And so are you saying we also get there through Kilburn? I think you could take either path. To finish my point on the, you could get there just by saying it's not a legislative act to silence a legislator for the rest of her term. You can look to the James Wilson quote. You can also look to the absence of historical precedence and the defendant's brief, they bear the burden, and they haven't been able to show a single example of silencing a legislator for the rest of their term. But it seems like, I mean, it seems like what the Wilson quote is getting at is generally speaking, it is a good idea to keep the executive and the courts out of this business of refereeing, the House refereeing itself, because writ large, through the Speech and Debate Clause, that will have positive impacts, and the dangers come when the other branches start to insert themselves here. And that won't always be the case, by the way, because sometimes there will be bad decisions made by bodies on what to do, but the idea of immunity is cost-benefit analysis, it's better to keep those other branches out. That's, I mean, I appreciate the quote, but that's like the bigger idea of it, isn't it? I just, I don't know how an opinion writes that way, given Bond and Powell, where the case is obviously recognizing that when there are extreme circumstances such as these that have affected the franchise of a legislator's constituents that have affected their ability to have a voice and vote in the House, that it is imperative for the judiciary to step in. And importantly, this court said- See, here's the difference I see between Powell, because I think that's your best case. I do think that's your best case. When I think of Powell, what I see happening in Powell is what the House did, and maybe you're going to say this is the same thing, but what the House did there, it can never, ever do, in the sense that it cannot refuse to see a member who has met the constitutionally limited qualifications. This case, the House, the beginning of this discussion we've had, is the House can sometimes, or often, gavel down its members as part of the regulating the process. So there you have a sometimes you can, sometimes you can't. In Powell, it's you never can, which, by the way, why I think your voting argument is strong, because I think that's more like Powell. But here, it's sort of sometimes you can, sometimes you can't. You're telling me you can't when it's speech that's external to the House, that has a longer duration, and I asked about viewpoint-based statements on the floor, and now we're really down in the mud. And that's what I'm worried legislative immunity doesn't let us do. Well, two things, Your Honor. One, I really do think our case, you should view the speech restriction and the voting restriction hand-in-hand. So you don't argue it that way in your briefs. You say, at the least, legislative immunity doesn't apply to the voting. You say that a number of times, I think, which to me is like, and my next argument adds to the gaveling down or the silencing, is of a different kind. Well, Your Honor, we of course acknowledge that Powell, which we too think is one of our strongest cases and a strong enough indication of why the Supreme Court did intervene and grant us interim relief. We agree that Powell defers the issue of relief against the speaker. And that relief question, I think, is really the only distinguishing factor between the speech restriction and the clerk restriction, and so it does take combining Powell with Gravel and Harwood, in this court's cases, to feel comfortable giving relief against the speaker. But as to whether the speech restriction is a legislative act, I again don't think that's a hard question. This court in Harwood said that the protections of legislative immunity must be interpreted in light of its purposes. We know its purpose is to preserve, in Justice Story's words, the voice and vote of a legislator. And when you have an assertive legislative act saying that we are indefinitely denying you that ability to speak, again, it's the antithesis of that preservation of voice and vote for each legislator. Now, on Powell, there's a couple acts involved there, one of which is the ultimate act of exclusion. And I'm actually not sure, as a matter of House practice or parliamentary rules, I do think you could possibly have a temporary exclusion, in the same way you could have a temporary gaveling down for a member violating the germaneness requirement. And what's going on in Powell, instead, is saying, we just think immunity is inapplicable, when this legislator is denied not just his vote, but his ability to be paid, his ability to participate on the House floor. And I think Powell helps us just as much on the speech restriction, so long as the court is comfortable looking to gravel, decided after Powell, to grant relief running against the speaker, because as best I know, it's the speaker's job, not the clerk's job, to make sure Representative Libby's microphone is turned on. Could you jump to my extraordinary character question, because I'm concerned that the examples Kilburn gives us are just different in kind from what we have here. Yes, so for the extraordinary circumstances, I would, again, I think it's most helpful, the particular circumstances of our case. The extraordinary circumstance is that the Maine House has denied Representative Libby not just her ability to vote, but also her ability to speak, those two combined restrictions are unprecedented, and they are diametrically opposed to what Justice Sorey said 200 years ago. But Kilburn, those examples are about the legislative branch attacking other branches, ordering the chief magistrate to be killed, acting as a court, imposing capital punishment, doing things that are, in our three-party, in our three-branch system, attacks or assertions of the rights of other two branches. And this is, again, maybe totally unconstitutionally dealing with itself. And that's where I'm not sure what Kilburn's talking about. At least as I read just the words on the page, it seems to be talking about the other branches in some way, which in this case does not involve. It's interesting. I read Kilburn a little bit differently. We, of course, agree that Kilburn identifies capital punishment as an example, and the main house is not asserting power to execute. However, a different way to read Kilburn would be to say, circumstances become extraordinary when the legislature starts collecting powers that belong elsewhere. And here, no legislator has the power to decide that his colleague has no vote, no speech, the Constitution decides that. Well, Marjorie Taylor Greene, I think, was stripped of all committee assignments for things she said. That's a pretty significant diminution of her authority. So, I mean, there are all sorts of things you can do within the House as the House runs itself. Why is that not the same kind of thing? Because at the end of the day, the sine qua non of being a legislator is going to the floor and casting that floor vote, again, with the ability to explain why you are doing so. I think the speaker would say, though, the same thing about his own acts and ability to gavel people down or to control the debate within the House. And maybe the case would be different if it was just about her ability to speak, but it's not. These two things have been tied together since February. And I actually think the availability of lesser punishments is quite interesting and a very helpful observation for us, that like Marjorie Taylor Greene or like the Oklahoma example represented, Lizzie could have been stripped of her committee assignments, but instead, Maine, for the first time in such an unprecedented way, since Bond and Powell said, you cannot speak and you cannot go on the floor. And I don't know that there's any other way to read the Supreme Court's order to say we think those things are different. There's actually no way to figure that out at all because what was brought to them was voting. They issued an injunction with no explanation and said she can vote. So what do I take out of that that gives me any help with the speaking problem? Because, again, they go hand-in-hand. But they didn't go hand-in-hand before the Supreme Court. What's the litigation strategy that then said we're going to push voting but not speaking? What was the decision? Why was that decision made? Because if they are the same, you would have asked for both. You're on a very high level of generality. I think when you are going to the Supreme Court on a very expedited schedule seeking extraordinary relief that the Supreme Court does not have to issue if you're right. They only have to issue it if you're right and it's worth their time. The case up there looks as much like Powell as possible. So you must have thought there's some difference, that our strongest point is both. No, I've acknowledged today the difference between the voting restriction and the speaking restriction is to whom the relief runs against. And at least here, now back before the preliminary injunction posture, while those two individuals are different, Gravel says at page 620 to 621, when the speaker is executing a resolution, relief can run against him. That's a more complicated argument to put before the Supreme Court when they're dealing with many other emergency applications and they have substantial, substantial discretion to deny relief. I don't understand that because the whole point of Gravel was both sides of that coin. So then the question was, which I think is also a hard question, for help there by the Supreme Court, well is the clerk engaged in a legislative act? Because the whole point of Gravel was those staffers were engaged in a legislative act. I can try to make the argument it is. A bill is not passed until the votes are announced. So what happens is the members cast their votes, the clerk reports the votes to the speaker, the speaker says by a vote of 75 to 70, the resolution is passed. That's the end of the passage of the bill. That never happened without the counting and reporting of the vote. I can recast that as a legislative act. And if I did, the clerk would be as immune as the speaker. So it really is, the coin has both sides to it. Yeah, your question is interesting because it's hitting on a level of generality problem in the case. We don't see the case, I don't think the Supreme Court's immunity cases frame cases like, is this tallying a vote? Is this speech on the House floor? I actually think they drop down to a level of specificity more similar to the way we frame it. So the asserted legislative act is the refusal to tally a vote. The asserted legislative act is the refusal to allow her to speak for the duration of her term like all of her other colleagues. And when those are the legislative acts, you then look to history to see, do we see those sorts of punishments anywhere else? And the absence of that punishment tells us, well, it doesn't look to be like something legislators ordinarily do, in the words of, I think, Tenney. And so we are going to step in as a court. When Gravel says there's a jaundiced view, what the court means is there's a jaundiced view toward extending immunity. We are only going to allow legislative defendants to raise immunity when it's essential to preserving the legislative process. So historical acts-wise, I mean, you've given me a quote that's sort of, it's an interesting quote, but it's at a very high, broad level of generality, and I think it can be used in a lot of ways. For the voting, you have actually some really good stuff, which is like the House Manual saying, like, we don't do this. But you don't have that for the speaking, or at least I didn't see it. We've looked high and low for examples that could help defendants on the speaking restriction, and there just don't seem to be any. And in this way, Wilson, the more recent case in Wilson, I think is a helpful decision. I acknowledge it's not an immunity decision, but Wilson has a lot of discussion about the history of verbal censures, and the driving theme in Wilson is legislatures tend to meet speech they don't like with more speech, the act of a verbal censure. And rather than shutting down speech, as has been done here, legislatures tend to engage in more speech, and that's consistent with the history we've read, where I think the absence of history is as probative as affirmative statements saying we're not going to gag you for the duration of your term. We just can't find an example of legislatures doing that, especially to get to the merits briefly, especially for protected speech. I think Folkless might be one of our best cases on that, where it says we don't find, the Ninth Circuit said, we don't find examples of suspending a legislator, which by extension would mean they cannot speak for their protected speech. We just don't see that, because it seems entirely at cost purposes, not just with Bond, but also the observation in Wilson, that we want legislators all airing their views and not having one side silenced over the other. Let me ask you just a different question. We know the Supreme Court has issued an injunction here ordering the clerk to count the votes, and we know the standard under the All Rights Act is indisputably clear. Is there anything for us to write about on that issue? Eventually we have to craft an opinion here. I do think it would be helpful to have an opinion saying we agree with the Supreme Court. But that's an odd thing to do. They have said, you are asking for the same interim relief here that you've obtained there, correct? Put the speaking aside, we're only focusing on voting now. Just for voting, she's ordered to vote. Slightly different, and I appreciate the opportunity to clarify, because I think there might be some confusion between the parties. When a Supreme Court grants an injunction pending appeal, that injunction will dissolve once this preliminary injunction appeal runs in court. And so if this circuit were to agree with the Supreme Court, which for all the reasons we think it should, then the preliminary injunction still needs to issue. Right. Or if the Supreme Court... But the record right now on violence of harm, I mean nothing has changed except that the Supreme Court issued the injunction, right? That happened, and we're here a couple weeks later. In the case, other than the changes the Supreme Court made, which is she can vote, I assume that's happening. But otherwise everything is the same, right? Correct. Right. I think that seems kind of obvious, right? And they applied a standard, at least as I understand from Justice Jackson's dissenting opinion, was it indisputably clear that she was entitled to relief on the voting? Answer is yes. Now, here we are, you're asking us for the same relief, and our question is, is there a likelihood of success on the merits? Do you agree that the standard the Supreme Court applied was a more rigorous one than we are applying? It's at least the same. It's not more rigorous. Okay. So the standard is the same, but the relief as a technical matter is slightly different. An injunction, if they have granted an injunction pending appeal, we're here speaking of preliminary injunction, which is an injunction pending final judgment. And so in terms of the piece of paper, we're— Right. I'm not saying you wouldn't get— But we could say that without saying anything else. I mean, I guess that's our question. You could say the standard is the same, and for those reasons, or the same or at least as— We could issue a preliminary injunction. Correct. Yes, yes. I think we're all in agreement on that. The only confusion that appears between the parties is that somehow the Supreme Court has finally resolved the case dispositionally. I agree with that. Yes, yes. I understand that. So I agree with that. But as far as sort of in a—we exist in this vertical stare decisis system. If we're looking to them, they have set the thing you're arguing about today, how it comes out on the merits. Do you agree with that? They have, and including on the equities too, right? We've got the same equitable factors for the injunction. So, yes, that's the same. Now, I do think it's quite helpful, all the reasons we won on the voting restriction, I do think apply on the speaking restriction. So if you were to write that opinion, what do you think the right reason is to say that it's beyond the House of Power? There are different arguments and different briefs. I mean, you have them all. The government stresses the 14th Amendment argument. You seem to lead with the First Amendment argument. What argument—and you could just say all, but that's not that helpful. What argument do you think and why is the best one on the merits? If I think the clerk is an employee who can be enjoined and over the remedy problem, what's the best argument on the merits? I think the best underlying argument on the merits for the voting restriction is probably equally both. But Bond—boy, does it seem like Bond disposes of the whole case on both speech and voting, where I think there should be no debate comparing Bond and Wilson that depriving a member of their speech indefinitely and depriving a member of their vote indefinitely both on behalf of their constituents is an adverse action under the First Amendment. Obviously, the voting restriction raises these questions. So, I mean, Kerrigan—I guess I was thinking, sort of Kerrigan says, this vote at least doesn't really belong to Libby in a First Amendment sense. It belongs to the voters of District 90 and what's being deprived. I mean, your position is—just tell me if this is your position. The House—we've had a long discussion about it. Sometimes you can gavel people down, sometimes you can't. We've had some discussion. You've explained why you think this case comes out the way it is. When it comes to voting, is your view never, under no circumstances, no matter what, no matter whether it's for the day, the minute, you cannot deprive a member of this House with the right to vote? For the voting restriction? Yes. No, because I think we can see based on Kerrigan, like for a day, you could be deprived of the right to vote because you have a recusal issue. That's a choice. Exactly. But as a punishment, can you ever be deprived of the right to cast a vote on a bill or an amendment on the floor of the House? As a punishment, I don't see the history suggesting that that's a legislative act. I don't see the history saying that that's permissible under— Which is different than speech, right? So there we think sometimes you can, sometimes you can't. I think for speech, we wouldn't deny that on the merits, the speaker could gavel someone down for running afoul of generally applicable rules. So imagine, for example, in New Hampshire, someone tried to call in remotely and give a floor speech in Cushing. We would say that's a violation of this generally applicable rule. Or if you call someone a bad name, they gavel you down. That's a punishment for indecorous behavior on the floor of the House. And by its nature, because it's targeted at this instance that happened on the House floor, it's going to be temporary. But if I said you engage in the same indecorous behavior, so on the next vote, sir or madam, you will not vote. You'd have a problem with that, right? Or would you? Are we talking about on the merits of the First Amendment retaliation? I'm trying to figure it out. I am reluctant or find concern about deciding the voting case on the First Amendment grounds because it strikes me that the 14th Amendment ground is sort of a general rule consistent with like the House manual that says you can never take someone's vote away because that's really not theirs. It's the people's vote. And so you are depriving the people through this punishment, not the legislator, the people. And so just like Powell, in Powell, you can never not see a member who meets the qualifications because the people have a right to have that person in place. You can never deprive someone of the vote because that vote belongs to the people. And you can never deprive the people of their right to have the vote. And that strikes me. But once you get into, well, sometimes you can take the vote away and sometimes you can't, and it depends on what kind of speech the person engaged in, then you're starting to make line judgments that make at least me uncomfortable because it starts to run into the problems that legislative immunity is about. Well, one, just to clarify, the people are present here. They're constituents of District 90 as plaintiffs. So the 14th Amendment harm is very much their harm and occurred between not just one day but between February and May until the Supreme Court's intervention. I think there are 14th Amendment problems as the history shows. Should the legislator be deprived of their vote for a week or two weeks or three weeks, I think that's how you explain the history. We've discussed in our brief that punishments tend to take the form of taking someone off a committee to which no one's really entitled to, but they don't take the form of denying that ultimate vote on legislation. But do you see, back to my question, do you see the person engages in intercourse behavior on the House floor? The speaker says there are going to be two punishments. One, I gavel you down. Two, we'll vote on this in the House. You will not participate in the very next vote. That's your punishment. I think we've already established that gaveling the person down from their speech when they made the intercourse comment is permissible. Do you think it's impermissible to deprive them of the vote? I do, and I think the best historical example of that are the Senate suspensions from the early 1900s where even 100-plus years ago, if you look at the Heinz precedent, that was the debate in the Senate. They said, hang on, these people have been suspended, and now on the next vote, you're not calling them on the roll call. And it was never resolved in the Senate, and then here we are today where the U.S. Congress engages in primarily verbal censure. And the House manual takes the position you can never leave the House. You can't take someone's vote away. Right. Yeah, I can't remember exactly what the second vote was on, but it wasn't related to the intercourse behavior. I think they had gotten into fistfights or something. I want to give a chance for other people to argue, and I know you are coming back on rebuttal, I think. Yes, Your Honor. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the amicus of the United States please introduce herself on the record to begin? Good morning, Your Honors. May it please the Court, Harmeet Dhillon for the United States. I'll just jump straight to the point. When the United States' interest in this matter is as briefed on the 14th Amendment issue, and we focused on the voting issue, and it is our view to answer the question, Judge Afrin, that you just posed, we do not believe it would ever be appropriate for the main legislature to suspend the right to vote in this case because the right to vote does not belong to Laura Libby. It's not an appropriate punishment, and it violates Reynolds v. Sims to take away that vote from all of the legislators. What is your position on the speaker and on silencing speech? Well, with respect to the debate question and gaveling down the legislator, I would agree with my colleague's argument here that it would be inappropriate for a – it would be appropriate in the case where it's a rule of general applicability, it's a decorum issue, and the sanction, if you will, is targeted to the specific speech in the legislature. I believe that would be an inappropriate use of the speaker's power. But to then extend that to say we're not going to allow her to speak on any issue whatsoever because of her intemperate remarks. So what's the predicate of that? I mean, I follow Kerrigan. I really do. I follow how that leads to the voting problem that seems that that lines up. What is the authority that applies to get to the same place with the speaking when it does seem like at least the conversation that we had was sometimes it's okay and sometimes it's not? And you're putting this on the not side. I follow that. But that requires judgment and line drawing on when the power can be asserted, which what makes me more comfortable with the voting is it's just all the time. It's what you said a second ago. This just cannot happen. This is beyond the power of the House to take someone's vote away. But we're still in the – I mean, it's a matter of characterization, but we're still in the – and now we're in a spot of sometimes you can gavel them down and sometimes you can't. And you presented a rule which is if the speech occurred outside the House and it's for an extended duration, we have a problem. But if it's in the individual speech because of what they said today, maybe they can be gaveled down for today. And, again, I'll admit it's the same question. What worries me about that is we are now the referees of individualized decisions where I think you all agree sometimes you can, sometimes you can't. And it will depend on the motives. It will depend on was it content-based. And that puts us in a very difficult spot. And I think that's part of what legislative immunity is supposed to do, which is keep us out of that spot. Well, Your Honor, the United States brief doesn't really go into the First Amendment issue. You know, that's – we're focusing on the rights of the voters. But since you're asking me, my position is go back to Bond v. Floyd. And in the Bond case, the court made the point very clearly that the speech aspect was directly tied to the voting aspect. It's weird there. Georgia didn't really raise legislative immunity there. Now I don't know why. Now, they weren't going to seat Mr. Bond, so Powell would have shown that they didn't have that power. Bond held that, you know, not seating him and that was the state, not the federal. But they said you can't not seat somebody because you don't like what he's been saying. And they didn't assert legislative immunity. So it's hard to know what to make of that. Because remember here, like I'm sort of running from the premise that this is unconstitutional. Like I'm using that as a background idea in this case, that this is content-based restriction against Representative Libby on things she said, and I'm assuming that. And then I get to the question of, well, okay, immunity sometimes protects unconstitutional conduct and is just one of them. So that's why I didn't find Bond that helpful to me because it doesn't wrestle with that. I won't disagree with you, Your Honor, but I would say that this isn't the hard case. And I'm not sure that this court needs to crash a rule for a hard case because this is an extreme case. This is an extreme case, an arbitrary case, a case of unilateral disenfranchisement for speech that occurred outside the legislative boundaries. I don't think it's frankly credible to argue that it is protected by legislative immunity. This isn't a closed case. There may be closed cases, and I'm sure the closed case may come before this court at some point. But that's where immunity makes me nervous because immunity isn't about, is it, the closed case. Immunity is about stay out of our business. Except in extraordinary cases. Right. And this is an extraordinary case. And so to answer the same question we asked your colleague, in terms of understanding what extraordinary means, we're instructed in Kilbourne what it means. But as Judge Afrin pointed out, those we're talking about, I think, quite different things here. How do you think we should think about extraordinary? If I may answer, Your Honor. In this case, I would say it is extraordinary because the sanction that was applied by the main legislature simply doesn't match any of the modern sanctions that are applied by other courts today. And you take Congress, there's a written manual there. But you even take all of the other states. We sought in vain for an example that would match the breadth and the extraordinary nature of the sanction to both strip the legislator and her constituents from representation, but also from a voice. And I do think that the bond holding about the obligation to take positions on controversial matters being part and parcel of the legislative duty is relevant in that regard. And so that is why you don't see other states, other legislatures, taking this type of an extraordinary position. It is too egenerous. And that is why it's extraordinary. So I would suggest that perhaps the rule for the difficult case could come at another time. This is not that difficult. Do you agree here that if we do as your colleague suggests and issue an injunction here regarding speech, it runs to the speaker? Yes. I see my time has expired if there are no other questions. Thank you very much. Thank you, Your Honor. And we appreciate the amicus briefing in this case. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellees please introduce themselves on the record to begin? Good morning, Your Honor. This is Jonathan Bolton, Assistant Attorney General at Counsel for the Defendants. I'd like to start by talking just a little bit about the Supreme Court decision that came up. And I do dispute that is dispositive of what this Court should do here on the voting. But it certainly has nothing to do with what the Court should do on the speaking question. But even on the voting question, I think the Court should take into account that that was a decision that was reached after light and fast briefing, no oral argument, and has no reasoning in it. But how do we deal with that? I mean, that's not how this system works. We're not here to say, well, they did a good job, a bad job, a great job. They do just what we start when we go on a couple of steps. Yeah. Justice Jackson says in the dissent that the standard applied by the Court to grant this injunction was that it was indisputably clear that interim relief was due on the merits. Do you agree with that? That's what she says in the dissent. Do you agree that she's right about that? Yeah. Well, I think that is the standard that has been announced in other cases. But we don't have reasoning. We don't know what they did in this case. Do you want to tell me something about why that's not the right standard? Your Honor, I think that is the standard that they've said in other cases. What I would suggest, Your Honor, is that there are some— See, I thought you were going to say that in Tannen v. Newsom, and I think there's another case, the Diocese of Brooklyn v. Cuomo, the Supreme Court did exactly the same thing but didn't articulate a standard at all. And maybe that's not what applies here, so we should do whatever it is that we think we should do. That's certainly true. I think there is a vacuum of knowledge on the part of all of us as to exactly what led the court to issue the order. And I think the reason why that's problematic here is because you have law of the circuit, and you have to look at your own case law in determining how to resolve this case. And that case law actually does have— Well, but that's not true. I mean, the law of the circuit doctrine certainly tells us that if the Supreme Court has done something different, we have to follow that. I mean, that's one of the exceptions to the law of the circuit doctrine. I think that's right, Your Honor, if you know why they've done it. But it's still a complicated question, right? Because our position is that Cushing and Harwood are dispositive of this case, that they are controlling case law that dictates the outcome. Right, but they said in their case law it's indisputably clear that she should have the right to vote. And so they granted her a preliminary injunction that this court affirmed the denial of. And so now we're sitting here with, I think, it feels like a lesser standard, because this is still a preliminary case. And we're only asking, is she likely to succeed? We've been told it's indisputably clear she'll succeed. Who are we to say anything else but that's right? Well, I think, again, you don't have any reasoning from them. So you don't know exactly what they looked at. Maybe they thought other factors in the test were more important. You just don't know. I mean, one possibility here, if you agreed that Cushing and Harwood were controlling. Has anything changed other than what they did? Has anything changed about the circumstances using all the factors now than when this matter went to the Supreme Court? Is there anything different you want to point out other than what the Supreme Court ordered to happen? No, I think we're in the same situation we were. So they took all of the – you agree that they were using the usual interim relief standard and came up with the conclusion she's entitled to it. Again, on an expedited schedule with no oral argument. And you're asking us to reach a conclusion. You're going to argue for something at odds with that. Well, Your Honor, if the court thought that Harwood and Cushing were controlling here, the process would go through the certiorari process. On a more fulsome briefing schedule, the court could look at whether they felt it was a cert-worthy question at that point. And then the Supreme Court would have you know. And you agree that the law of the circuit doctrine says we don't follow our own cases if they are in conflict with subsequent Supreme Court cases. I think that's generally the rule, Your Honor. I don't think that – I'm not aware of a law of the circuit case that specifically addresses decisions with no reasoning that appear on the emergency documents. I guess I think our worry is that – and I agree with you. I particularly think Harwood is a hurdle for us. But based on what the Supreme Court's done, it seems to me the answer from the Supreme Court is either Harwood is just wrong based on our Supreme Court precedent or Harwood is distinguishable. And you first have to figure out a way to say that it's distinguishable. My sense is the way to do that might be to distinguish the speech and the voting issue here. But it sounds to me like you're saying we don't know what the Supreme Court did, so you could just follow your circuit precedent. Which is kind of what we did when we addressed this day, right? We cited to our cases. It seems like that maybe was – the Supreme Court thinks that was wrong. I'm not denying that there is an inference that can potentially be drawn based on what they did. I'm saying we don't know for sure what the reasoning was. You have cases in your circuit, too. What else could it be? Well, we don't know how the factors were balanced and which factors – But I've asked you, is there any difference between the factors as they exist now as they exist, but then you told me there isn't. So whatever it is. Our job – I know reasoning is nice. I understand that. I spend my life writing out reasoning. But at the end of the day, courts are about judgments. And they issued a judgment. And that judgment says, she's entitled to interim relief to vote. And I'm asking you, has anything changed since they did that? And you say no. And are the factors any different? No. Well, at most, possibly they're applying a higher standard than you, but if they're not, it's the same. And they've decided it. And then you stand there and say, do something else because they didn't explain themselves. Well, they don't have an obligation to explain themselves. That's nice when they do. But they don't have any obligation to do so. So how can we – not should we – but how can we do something different if this system is supposed to work the way it does, which is we are – take their instructions and execute them? I mean, I think they were deciding a different procedural question in the case, which is whether to stay in a state – or enjoin things for a brief period of time so this could be more fulsomely considered by this court. So it's a – they're considering a different issue. So I think there is an open question about to what extent is that binding precedent in this different procedural posture, as opposed to them just saying, let's – you know, we'll restore the voting rights while this thing proceeds and then we'll take a look at it when it goes up in certiorari. I'm not aware of a case that says, again, an emergency docket order with no reasoning is precedential in the next sort of phase of the case. Let's maybe jump to the – Sure, sure. – to the substantive issues. Sure. I want to just talk about – I think one of the things that I did not hear at all, what my friends argued, is the fact that the argument seems to be, both with the voting and the speaking, that this is some sort of targeting of one specific legislature, whereas in Cushing and Harwood, what we're talking about are sort of generally applicable rules. This is a generally applicable rule that we're talking about in this case. This is rule 401-11. It's been part of the main – the main house since 1820 and in the Massachusetts House of Representatives before that, since at least 1802, it's governed every single legislator who's ever served in the main house. And it provides that if you are found to be in breach of the rules, these two penalties or punishments are the things that you're subject to. You cannot vote and you cannot speak until you make satisfaction. So that's a generally applicable rule. And I think your precedents are, in Cushing and in Harwood, that are very clear that when the legislature or the House of Representatives is either applying or enforcing a generally applicable rule that governs proceedings within the house, that those – that those actions are covered by legislative – If I accept that premise, and I just think the generally applicable rule of using voting as a punishment is in all circumstances, no matter what the situation, an unconstitutional one beyond the power of a state legislature to use, does legislative immunity shield that? Legislative immunity shields unconstitutional acts. I mean, I think that's been stated over and over again by this court. But there does seem to be a distinction. At least I find a distinction. I sometimes have trouble articulating, but I'll try again. That in Powell, it seems like the gist of that was, as long as someone meets the qualifications, which Powell did, they must always be seated. There is no discretion to choose whether to seat someone. Therefore, this was totally beyond the power of the House to do. And therefore, because of that, it's non-legislative, and you can enjoin these people to take certain actions to give him his seat. And I think the voting, at least as I read Kerrigan and I look at the House manual and I start to think about those things, it strikes me that there might be a way to say, you just can never do that. And that strikes me as beyond the immunity. Whereas the speaking seems to me shades of gray. Sometimes you can. Sometimes you can't. It's case-specific. It's context-specific. And that's what we really don't want courts doing, because that's interference on a granular level. And we're very worried about that. We're at this sort of it's beyond the power or less worry. Does that make any sense? Your Honor, I agree with you in that I think if this court were to intervene in the speaking restriction, it would be more problematic under the doctrine of legislative immunity for exactly the reasons you're saying, in that you would be – first of all, you'd have to issue an injunction running directly against the Speaker of the House about what he can do on the floor when people rise to speak. And I cannot imagine a more direct – And is that about the Speaker? Because I read Gravel the way your friend did, which said it's not really about the name of the officer. It's about the act. So what makes that more troublesome? I think it is more troublesome. Is it that it's the Speaker or that it's about refereeing the floor? I think it's both. I mean, I think the modern trend in legislative cases is you're looking more at the act than you are at the Speaker. I'm not sure that the pre-Gravel distinction where it's the Speaker, I think that's what Gravel changed, right? I'm not sure that's completely gone in the case law and that it does seem like a worse intrusion into legislative – the sphere of legitimate legislative activities to be telling the Speaker of the House, the officer elected by the other members, to preside over the House, how he should preside. That strikes me as a very extreme judicial intervention into the workings of the legislature. So I think it's not irrelevant, but it's more the act. I guess your opponents then would define the act differently than we just have here, which is the act is the act of silencing for a term. It's the passing of that resolution. Is that a way to sort of get around the legislative act problem that we seem to be having? The problem, I think, with that argument is that they have been very clear they're not challenging the censure. They're challenging the application of the punishment. And the application of the punishment is based on this rule, which, again, has been on the books since 1820. So this is a – it doesn't matter what the breach of the rule is. I mean, it could be anything. And if the House votes by majority that the member has violated whatever the rule breach is, they have to make satisfaction based on what the resolution requires them to do to make satisfaction. So the fact that they're not challenging the censure itself I think is problematic. It's really this rule, this universal rule, and that makes it no different than Cushing or Hartwood. I mean, in the Cushing case, that was actually – not only was that about enforcement of a rule, that was an enforcement of a rule that the claim was specifically that it was preventing members from voting. I mean, that was literally the claim. But they really weren't preventing. I mean, they had to make a choice. Yeah, they called it – I mean, I think Hartwood called it a Hobson's choice. They had to make a hard choice. There's no doubt about it. But that is the difference. Like, that is a distinction between this case where she has no choice. Well, Your Honor, I respectfully disagree because she has the choice to make satisfaction. And I think that's why this is not a suspension case. She was said as a violation of her First Amendment rights of compelled speech. And, you know, I mean, she definitely would have arguments that you shouldn't be allowed to do that. I think she would have arguments, but I don't think it's clear that a required apology, even if it's compelled speech, I don't think that makes it per se unconstitutional. I mean, I think there's a whole analysis that goes into that. And I think you would also have to look at the fact that this is not a private citizen that's being asked to apologize. This is a member of a body where there's a long tradition. We talk about, you know, in colonial times, forced apology was a common remedy. So you know about your tradition. Does this tradition exist beyond Maine and Massachusetts? Well, we've cited some other provisions. In Arizona and Connecticut, both have the exact same, or almost, that's probably not exactly the same, but roughly the same provision. As to voting and speaking. As to voting and speaking, that's right. The same thing, make satisfaction. And, you know, these are obviously, these all come, I don't know if they all originally come from Massachusetts, from the 13 colonies, but this is, you know, an old rule that other states have adopted. We found other examples of states that used to have it. The Territory of Washington, Florida, used to have it. They don't have it anymore, but they did. The House of Representatives does not have it as the voting. I'm sorry. The House does not have it as the voting. The U.S. House does not. That is correct, yeah. And as far as we can tell, they've not had that rule. In the U.S. Senate, it's unclear. Is that what it is? Well, the U.S. Senate has a rule on, the U.S. Senate doesn't, they have in the past, in the 1902, I think, or 1903 incident, they did hold members in contempt in what amounted to a suspension where they were prevented from being able to vote. They don't have a rule on this, is my understanding, but they did do it. So there is a history of doing it. And there's also, we cite many, many jurisdictions that have rules about suspending members. In California, it's right in their constitution that they can suspend members. So that's a fairly common provision around the country. I tried to make an argument that voting is sort of beyond the pale of the power that you have. You make the best argument to me about why they want to say they are the same, they merge. They are twins in this sort of, because the theory is the voting is different because it belongs to the people and you can't punish her by taking something away from the people. That's the argument. What is the best argument to say that those are not twins? They are separate. And if you think about voting that way, maybe you come out that way on voting, but you should come out differently on speaking. Why? Well, there's all sorts of rules about, I mean, if you look at the rules of the house or in the record, there's all sorts of rules about when you can speak and when you can't speak. I mean, it's a heavily regulated thing that the speaker in the rules has control over the debate. So, you know, this is something that's inherently, I think, within, to some extent, within the discretion of the speaker to decide how those, how people are going to speak on the floor, how that's going to work. And you can, in fact, you know, the Kerrigan's, you know, it certainly talks about the vote being entrusted to the, you know, be held in trust for the constituents. It doesn't say anything similar about speaking. So, I don't see them as the same. I mean, you can certainly vote and you can carry out the, you know, the will of your constituents and not have any ability to speak in that you're still able to, you know, carry out that aspect of your function. So, I think they're two separate things. And again, certainly, the speaking restriction, you know, to the extent the court feels it has to draw a distinction between the two, there's no question that the speaking restriction is going to be, you know, a much greater intrusion on legislative immunity. I want to give you a moment if you have any other final thoughts or if there's anything in your argument that we haven't touched on. I mean, I guess the one thing I would say about, you know, extraordinary circumstances is that you're absolutely right that the test is extremely high. You called it a demanding standard. And, you know, I think that the one example we have other than, you know, ordering capital punishment of people in other branches is, you know, you said in Harwood, I believe it was, that, you know, a rule is invidiously discriminatory on its face. And I think it's notable that Judge Selyev talked about it that way, right? Because that would be something that you could adjudicate without having to get into the motives of legislators, without having to take depositions of people, without having to, you know, do all the sorts of things you would have to do if you were to have sort of this lower standard where whenever there was sort of what was considered to be a serious... And so they would say this is invidiously discriminatory on the grounds of content-based speech. Look at the face of that whereas clauses in that resolution to silencer. That is a clear violation of the First Amendment. Why is that any better or worse than a racially-motivated equal protection that's plain on its face? To be clear, Your Honor, we don't agree that it's a clear violation of the First Amendment. We don't agree it's a violation of the First Amendment at all.  Because there's a long history and tradition which we cite in our briefs of punishing members, censuring members for speech inside and outside the body. Again, it's different when you're a member of a legislative body. Your rights and responsibilities are different than if you're just an undifferentiated member of the public posting something on social media. You have a different responsibility and the First Amendment should treat that differently. So you think that a legislator forfeits their rights to speak in public without the government punishing them because they're a legislator? No, Your Honor. What I'm saying is that there should be a different standard and that there is a long history and tradition here. I mean, they would say there's not. And you haven't pointed to any case about outside punishing people for free speech. So they would say, I think, they would say this person went out and made unpopular remarks and said whatever she said and then the response of the government was, we don't like that, you are punished and here's the punishment. And that lines up quite nicely with how the First Amendment operates. Well, Your Honor, I would disagree with you in that to the extent, I think my friends want to characterize this as punishing a political viewpoint about an issue and that is not at all what occurred here. I think if you look at the central resolution, you can see that. The concern was that the social media posts put into jeopardy a specific identified minor. Do you think if she wasn't a legislator and she were put in jail for that, she'd have a good First Amendment argument? If she were put in jail, she may, she may. I mean, that's not what happened here though, Your Honor. You know, this is an attempt of the body to protect its integrity, to protect its reputation and taking a reasonable step to do that and following a rule to do it that's been in place for centuries. And I think the body has a very strong interest in protecting its reputation and integrity. That's the Montserrat case in the Second Circuit that talks about that, you know, where they expelled a member because they felt that, you know, conviction that he had had impugned the reputation. And that's a separate power they have that they either chose to or couldn't use. That is a separate power that could have been used. That's right. I mean, that doesn't mean it's the only approach they could have taken, but that was a different, another option that they had. Thank you very much. Thank you, Your Honor. Thank you, counsel. At this time, will counsel for the appellants please reintroduce herself. On the record, she has a rebuttal. Hi, Ms. Meehan on behalf of the appellants. Very quickly, we've not framed this as a facial challenge to the House rules. We're framing it as a challenge to the ongoing conduct. No difference in the discussion that happens in DRAVL at pages 620 to 621. My friend on the other side emphasized just how old this rule is. We think that's helpful for our argument that the rule is pretextual. It's been in place for over 200 years and for the first time was applied in 2025 to indefinitely silence a duly elected legislator. On your questions, Judge Aframe, about sometimes you can, sometimes you can't, and just isn't that an immunity problem with respect to the speech? You could say that about voting too, by the way, in Maine. There are rules in Maine, Rule 401 says you can't tear your vote. Obviously, there are rules about sometimes you can, sometimes you can't with voting. What matters here, the dividing line that I think is administrable and fully supported by Harwood and Cushing, is whether we're talking about a judicial challenge to a generally applicable rule where we really are refereeing the floor debate, was it germane, wasn't it germane, versus singling out one legislator or a group of legislators to indefinitely silence them. And the hypotheticals offer themselves. Imagine that the House wants to pass a resolution that for an abortion bill we're only going to allow women to speak, or for a bill relating to religion we're only going to allow churchgoers to speak, or as defendants conceded, for every bill we're only going to allow members of one race to speak but not members of another. Our core argument is we fall into that latter category, that when Representative Libby pushes her button, she just gets to be recognized like everyone else, consistent with the generally applicable House rule. That's how the House has worked for 200 years. And they would say the generally applicable House rule, before that session started, there was a rule in place on day one, they adopted their rules or whatever they do, that said if certain things happen, this is the punishment. So they say that's a general rule that everyone knew about and we used it. So what makes it general, what does that even mean? I mean that's just a frame you've put on it, but they put the opposite frame on it. Because we're not, we don't think that the defendants can just point to this House rule which is very generally phrased and doesn't say if you make a quote on Facebook you can't see, I mean they're just pointing to a general rule. But nobody knows what I'm going to say that's going to be deemed in decorous either. I mean things happen and they make decisions and they make it based on the rules, and these are the rules. And for 200 years the legislature has never seen that rule applicable for speech that occurs outside of the House. So again, I do think it's pretextual. It runs headlong into bond. What my friend on the other side just said to you about the First Amendment claim is irreconcilable with bond. The problem is he can't be here. He can't vote. He can't come to the House. He is not a member of the House. This woman, Representative, is a member of the House, I think probably, you know, is a strong argument for voting. But then this thing is not allowed to her for this reason pursuant to applicable rules. I mean it's not the same punishment as bond, which was sort of the death penalty punishment. You're just not a member of the House. Your Honor, may I finish with this? Please. So with respect to bond, in a way it was. He, ex-ante, was not allowed to speak or vote on behalf of his constituents because of something he said on the radio with respect to Representative Libby. She is not allowed to speak or vote on behalf of her constituents. There's a bundle of sticks, right, like property, right, that makes you a legislator. And they said to him, you're just not a legislator. Here we're saying this one thing that you usually get to do, you can't do pursuant to our rules, and other people can't do it either for other reasons, and that's what's happening here. I don't think that's right. I think Wilson talks in terms of any function of a legislator. Speaking and voting are the two core functions. That's how Wilson distinguished bond. And importantly, the speech, not just the vote belongs to her constituents, the speech does too. We've cited cases in our brief explaining that, like the Fourth Circuit case in Daly. But the point in bond that I think is so important is on pages 135 to 136 is the point that we expect legislators outside of the State House to take positions on the controversial issues of the day for their constituents. And that is exactly what's happened here. The Maine House, until now, has never said that that's a violation of any rule. And to deny a legislator her speech and her vote indefinitely for the rest of her term is a de facto expulsion. The Maine House is hurtling toward the end of their session. We expect potentially 500 more floor votes between now and the end of July. We respectfully ask the court to reverse and to order entry of a preliminary injunction. Just so I'm clear, she can participate in those votes as of today until this court does something? She can participate in those votes unless the court does something. She cannot speak, which is one of her two central functions as a legislator, and has the effect of diluting the power of that vote vis-a-vis the other members. They go hand in hand. Thank you. That concludes argument in this case.